**United States District Court**
**Northern District of Indiana**
**Fort Wayne Division**

| | |
|---|---|
| STATE OF INDIANA,<br>    *Plaintiff,*<br>v.<br>JOSEPH R. BIDEN, JR., in his official<br>    capacity as President of the<br>    United States;<br>UNITED STATES OF AMERICA;<br>U.S. DEPARTMENT OF HOMELAND<br>    SECURITY;<br>ALEJANDRO MAYORKAS, in his official<br>    capacity as Secretary of Homeland<br>    Security;<br>U.S. CITIZENSHIP AND IMMIGRATION<br>SERVICES;<br>UR JADDOU, in her official capacity<br>    as Director of U.S. Citizenship and<br>    Immigration Services;<br>U.S. IMMIGRATION AND CUSTOMS<br>ENFORCEMENT;<br>TAE D. JOHNSON, in his official<br>    capacity as Acting Director of U.S.<br>    Immigration and Customs<br>    Enforcement;<br>U.S. CUSTOMS AND BORDER<br>    PROTECTION,<br>and;<br>CHRIS MAGNUS, in his official<br>    capacity as Commissioner for U.S.<br>    Customs and Border Protection<br>    *Defendants.* | Civil Action No. 1:22-cv-192-HAB-SLC |

<u>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

1.     All sovereign nations have the right and responsibility to protect their borders. Under our Constitution, the responsibility for doing so primarily falls upon the federal government.

2.     Since the start of the Biden Administration, the Defendants have disregarded and ignored the plain language of 8 U.S.C. 1182 and 8 U.S.C § 1225(b)(1) – (2) by multiple means, including promulgating regulations contrary to congressionally enacted statutes and contriving to release hundreds of thousands of illegal aliens from the border into the interior of the United States.

3.     A record number of immigrants enter the United States on a daily basis.

4.     Some immigrants have legitimate claims for asylum or refugee status. Some, however, arrive with nefarious intentions, such as drug trafficking. There has been a 4,000 percent increase in fentanyl seizures at the southern border over the last three years.[1]

5.     Congress created a system for processing immigrants arriving in the United States providing three options to the Administration: (1) detention under 8 U.S.C. § 1225(b)(2)(A), (2) returning the immigrants to Mexico or Canada pursuant to 8 U.S.C. § 1225(b)(2)(C), or (3) granting parole under 8 U.S.C. § 1182(d)(5(A).

6.     Aliens arriving in the U.S. are required by law to be detained pending a determination as to whether they have a valid basis to enter the country. *See* 8 U.S.C. § 1225(b)(2)(A).

---

[1] https://www.nbcnews.com/politics/immigration/fentanyl-seizures-u-s-southern-border-rise-dramatically-n1272676.

7.      This rule applies "whether or not" an alien arrives at a "designated port of arrival" or crosses into the country illegally. *See* 8 U.S.C. § 1225(a).

8.      The only circumstance that permits an alien, who is otherwise inadmissible, to be released into the United States without such proper determination is when the government grants a temporary parole on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. 1182(d)(5)(A) (emphasis added).

9.      Every removal proceeding to determine the "deportability or admissibility of an alien" is initiated in immigration court through a notice to appear. 8 C.F.R. § 1239.1(a).

10.     A notice to appear can be issued by any immigration officer "performing an inspection of an alien arriving at a port-of-entry." 8 C.F.R. § 239.1.

11.     The Biden Administration is ignoring these requirements. Instead, since the Administration has taken office, it has released at least 515,538 otherwise illegal aliens with a Notice to Appear/Own Recognizance.[2]

12.     A notice to appear is a lawful document; however, the number of aliens released on their own recognizance is unlawful because the aliens should be detained, returned to Mexico (or Canada), or granted parole – not unilaterally released into the United States.

---

[2]    https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfer tab) (266,714 released between October 2021 and July 2022) and https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2021 (U.S. Border Patrol – Dispositions and Transfers tab) (248,824 released between January 2021 and September 2021 at Southwest Border).

13.    Alternatively, thousands of aliens are receiving a grant of parole from the Defendants without the requisite case-by-case review and meeting the standards for either a "significant public benefit or humanitarian need" pursuant to 8 U.S.C. § 1182.

14.    In 2021, the Biden Administration began unlawfully issuing a "Notice to Report" to aliens entering the country. A Notice to Report does not exist in the statutes and regulations for immigration.

15.    Between January 1 and October 31, 2021, U.S. Customs and Border Protection ("CBP") released 94,581 otherwise illegal aliens issuing a made-up Notice to Report.[3]

16.    In November 2021, the administration replaced the Notice to Report with a policy called "Parole + ATD" or "Parole and Alternative to Detention." This policy—which was first disclosed by the government in another challenge to its unauthorized release of migrants—represents another effort to evade detention requirements.  Under the policy, federal officials are authorized to release migrants into the United States not just where the release of a particular alien is required by urgent humanitarian reasons or would provide a significant public benefit but to reduce overall crowding in detention facilities.

17.    The effect of the policy is "to parole aliens *en masse*"—the very thing that the government "cannot" do under § 1182(d)(5)(A). *Texas v. Biden*, 20 F.4th 928, 997 (5th Cir. 2021). The memorandum claims that this "alternative path" will be used

---

[3] https://www.cnn.com/2021/11/16/politics/dhs-migrants-paperwork-ice-notice-to-appear/index.html

sparingly, but the government has released over 250,000 aliens between October 2021 and July 2022 using the Parole + ATD policy.[4]

18.    The commands of Congress are clear, and the government does not get to ignore those commands. The Biden Administration has actively sought to eliminate any available processes to increase its resources and detention capacity. The Administration has also sought to reduce the number of immigration detention beds available. These actions and the Administration's policies have encouraged more individuals to journey to the southern United States border, exacerbating its purported resource issue.

19.    The Biden Administration's border policies are contrary to law and cause harm to Indiana. A portion of the aliens illegally released into the United States are arriving or will arrive in Indiana.

20.    Indiana has approximately 100,000 to 124,000 illegal aliens living in the State: roughly 53% are uninsured; 17% have incomes below the poverty line; and cost Indiana taxpayers more than $549 million a year.[5] If more illegal aliens enter the State, that will increase costs, including to the State's healthcare system.

---

[4]    https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfer tab) (252,309 released between October 2021 and July 2022).

[5]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/IN (102,000, 53% uninsured); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (100,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (123,860, $549 million annual cost).

21.     On information and belief, over 1,200 individuals reported to the Indianapolis ICE office with a Notice to Report between April 2021 and December 2021.

22.     The increase in illegal aliens arriving in Indiana has forced Indiana to incur additional expenses.

23.     The Indiana Department of Education provides a portion of the State's Title III (of the Elementary and Secondary Education Act of 1965 as amended by the Every Student Succeeds Act of 2015) appropriation to support schools and school districts experiencing an influx of immigrant students.

24.     The purpose of Title III is to help ensure that English learners attain English language proficiency and meet state academic standards.

25.     Based upon the influx of immigrant students in eight school districts, the Indiana Department of Education made Title III appropriations in the amount of $183,738.40 for the 2021-2022 school year, in addition to the per-pupil state tuition support payment.[6]

26.     Upon information and belief, some or all of these immigrant students are illegal aliens in the United States.

27.     This Court should declare unlawful and enjoin the Biden Administration's unlawful use of its limited parole authority.

**PARTIES**

---

[6] https://www.in.gov/doe/files/2021-2023-TIII-Immigrant-Influx-Allocations.pdf

6

28.     Plaintiff State of Indiana is a sovereign State, subject only to the Constitution of the United States. Indiana sues to vindicate its sovereign, proprietary, and *parens patriae* interests. The Defendants' operation of the immigration system injures Indiana in multiple ways.

29.     Defendant Joseph R. Biden, Jr., is the President of the United States. Indiana sues him in his official capacity.

30.     Defendant United States of America is the federal sovereign.

31.     Defendant U.S. Department of Homeland Security ("DHS") oversees Defendant U.S. Citizenship and Immigration Services ("USCIS"), Defendant U.S. Immigration and Customs Enforcement ("ICE"), and Defendant U.S. Customs and Border Protection ("CBP") as constituent agencies of DHS. DHS and its constituent agencies administer the Immigration and Nationality Act ("INA").

32.     Defendant Alejandro Mayorkas is the U.S. Secretary of DHS. Indiana sues him in his official capacity.

33.     Defendant Ur Jaddou is the Director of USCIS. Indiana sues her in her official capacity.

34.     Defendant Tae D. Johnson is the Director of ICE. Indiana sues him in his official capacity.

35.     Defendant Chris Magnus is the Commissioner of CBP. Indiana sues him in his official capacity.

## JURISDICTION AND VENUE

36.     The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703.

37.     The Court has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to order the declaratory and injunctive relief that Indiana requests. Indiana's claims are not subject to the INA's denial of jurisdiction for claims on behalf of an alien, 8 U.S.C. § 1252(g), because it is bringing this suit for the benefit of itself and its citizens.

38.     This district is a proper venue because the State of Indiana resides here and a substantial part of the events or omissions giving rise to Indiana's claims occurred here. 28 U.S.C. § 1391(e).

## FACTS

### The Relevant Federal Immigration Scheme

39.     "The Immigration and Nationality Act ("INA") . . . establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985).[7]

40.     When aliens arrive in this country, either at a port of entry or when caught crossing the border illegally, they are subject to 8 U.S.C. § 1225. Section 1225(b)(1) requires the immediate removal of aliens who are inadmissible due to fraud, misrepresentation, or lack of valid documentation, "without further hearing or review," unless the alien indicates either an intent to apply for asylum or expresses a

---

[7] Many of the INA's references to the "Attorney General" are understood to now refer to the Secretary of DHS. *See La Forestry Ass'n, Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(A)(i). If the alien makes such an indication, then an immigration officer interviews the alien to determine whether he or she has a credible fear of persecution. 8 U.S.C. § 1225(b)(1)(A)(i); 8 U.S.C. § 1225(b)(1)(B). If the immigration officer determines that the alien has a credible fear of persecution, then the alien "*shall be detained* for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added).

41.     Aliens who do not fall under the criteria of Section 1225(b)(1), *i.e.*, aliens who are *not* inadmissible due to fraud, misrepresentation, or lack of valid documentation, are governed by section 1225(b)(2). An alien subject to section 1225(b)(2) must show that he or she is "clearly and beyond a doubt entitled to be admitted"; otherwise, that alien "shall be detained" pending further immigration proceedings. 8 U.S.C. § 1225(b)(2)(A).

42.     If aliens are not detained or returned to Mexico (or Canada) under 8 U.S.C. § 1225, then the only remaining option is to utilize the Defendant's parole authority, which is provided in 8 U.S.C. § 1182(d)(5)(A). The Defendants can only use this authority "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit":

> The [Secretary of Homeland Security] may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe *only on a case-by-case basis for urgent humanitarian reasons or significant public benefit* any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the

same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A) (emphasis added). Other than parole, there are "no other circumstances under which aliens detained under § 1225(b) may be released" into the United States. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018).

43.     If the alien has raised a persecution claim, parole under § 1183(d)(5) is "permitted only when [DHS] determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(4)(ii).[8]

44.     If no threat of persecution has been raised, parole is governed by 8 C.F.R. § 212.5(b) which limits parole to people with serious medical conditions, pregnant individuals, minors under certain circumstances, witnesses in judicial, administrative, or legislative proceedings, or not in the public interest as determined by an immigration official defined in 8 C.F.R. § 212.5(a).[9]

45.     Earlier statutes gave the Attorney General much broader parole authority. The original version of the Immigration and Nationality Act of 1952 gave the Attorney General discretion to "parole into the United States temporarily under such conditions as he may prescribe . . . any alien applying for admission to the United States." Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163, 188

[8] The Defendants are attempting to change how claims for asylum are determined in an Interim File Rule, 87 Fed. Reg. 18,163 (Mar. 29, 2022), which goes into effect on May 31, 2022. The Interim Final Rule has been challenged by 19 states in *State of Arizona, et al. v. Garland, et al.*, No. 6:22-cv-01130, U.S. Dist. Cout, Western District of Louisiana.

[9] Determinations regarding parole are also implicated in the Interim Final Rule, 87 Fed. Reg. 18,163 (March, 29, 2022).

(1952). The executive branch used this parole power on multiple occasions to release large groups of illegal aliens into the United States. *See* T. Alexander Aleinikoff et al., *Immigration and Citizenship: Process and Policy* 300 (9th ed. 2021).

46.     In response, Congress amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power. The Refugee Act of 1980 added section 1182(d)(5)(B), which prohibits the executive branch from paroling refugees unless "compelling reasons in the public interest with respect to that particular alien require" parole. Pub. L. No. 96-212, 94 Stat. 102, 108. And the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) amended section 1182(d)(5)(A) to allow for parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Pub. L. No. 104-208, 110 Stat. 3009, 3009–689. *See also Texas v. Biden*, 20 F.4th 928, 946-47 (5th Cir. 2021) (discussing the statutory history of the parole power); *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that this statutory change "was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

47.     "Urgent humanitarian reasons" or "significant public benefit" evidence extraordinary circumstances. *See Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States*, U.S. Citizenship & Immigr. Servs., [https://www.uscis.gov/humanitarian/humanitarianpublicbenefitparoleindividualsoutsideUS](https://www.uscis.gov/humanitarian/humanitarianpublicbenefitparoleindividualsoutsideUS) (explaining that, in granting parole for "urgent humanitarian reasons," U.S. Citizenship and Immigration Services officers consider, among other things, whether

11

the "circumstances are pressing" and whether the alien's reason for being in the country "calls for immediate or other time-sensitive action").

48.     The government is also required to initiate removal proceedings against aliens with a credible asylum claim by serving the alien with a charging document, which initiates proceedings in immigration court. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (b)(1)(B)(iii)(I), (b)(2)(A). For ordinary removal proceedings, the charging document is referred to as a "notice to appear." *See* 8 C.F.R. § 1239.1(a).

<u>The Biden Administration's Actions</u>

49.     The Biden Administration is systematically violating each of the immigration requirements.

50.     The Defendants fail to utilize their statutory authority under 8 U.S.C. § 1225(b)(2)(C) to return aliens to Mexico (or Canada) or detain those aliens pursuant to 8 U.S.C. § 1225(b)(2)(A).

51.     Instead, the Defendants created a Notice to Report, unsupported by the statutory scheme, rather than issuing a notice to appear upon release and released thousands of aliens into the United States.

52.     Defendants, in turn, introduced the Parole + ADT policy utilizing the parole authority under Section 1182 to release thousands of additional aliens into the United States, rather than following the statute and granting parole on a case-by-case basis.

53.     The Defendants have revealed the extent of their non-compliance with federal law in documents filed in the U.S. District Court for the Northern District of

Texas. Defendants' Monthly Report of Dec. 15, 2021 at ECF 119-1, *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552546 (N.D. Tex. June 7, 2021). A chart from one of those filings shows the number of CBP releases of aliens under Section 1225 between January 21, 2021, and November 30, 2021:

**(6) The total monthly number of "applicants for admission" under Section 1225 released into the United States, paroled or otherwise."[14,15,16]**

| Southwest Border Releases | Jan 21 - 31, 2021 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| U.S. Border Patrol Total | 1,263 | 8,798 | 26,032 | 25,882 | 26,343 | 34,731 | 60,548 | 57,655 | 42,936 | 27,619 | 38,916 |
| Notice to Report | | 1 | 7,570 | 11,338 | 7,534 | 13,941 | 32,749 | 18,818 | 2,626 | | |
| Notice to Appear - Order of Release on Recognizance | 1,263 | 8,797 | 18,462 | 14,544 | 18,809 | 20,790 | 27,799 | 25,284 | 18,417 | 17,760 | 33,247 |
| Parole Disposition | | | | | | | | 13,553 | 21,893 | 9859 | 5,669 |
| Office of Field Operations Total | 271 | 889 | 1,607 | 2,994 | 5,731 | 8,156 | 10,706 | 10,519 | 3,948 | 3,619 | 4,197 |
| NTA and Paroled into the U.S. on a case-by-case basis pursuant to 8 U.S.C. § 1182(d)(5) | 148 | 536 | 1,204 | 2,537 | 5,244 | 7,651 | 10,068 | 9,962 | 3,412 | 2,997 | 3,554 |
| Parole Disposition | 123 | 353 | 403 | 457 | 487 | 505 | 638 | 557 | 536 | 622 | 643 |
| Parole Disposition (ICE Declined to Detain Indicator) | 5 | 8 | 32 | 77 | 17 | 19 | 26 | 35 | 37 | 28 | 23 |
| Total | 1,534 | 9,687 | 27,639 | 28,876 | 32,074 | 42,887 | 71,254 | 68,174 | 46,884 | 31,238 | 43,113 |

54.     As the chart illustrates, that number was as low as 9,687 in February, 2021, went as high as 71,254 in July of 2021, and has fluctuated since then—never going below 27,000 releases in a month. Combined, between January and November of 2021, Defendant CBP released into the United States at least 403,360 illegal aliens apprehended along the Southern Border. In December 2021, CBP released at least 55,626 illegal aliens. Defendants' Monthly Report of Jan. 12, 2022, ECF 124-1 at 6, *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552546 (N.D. Tex. June 7, 2021). In January 2022, CBP released at least 46,186 more. Defendants' Monthly Report of Feb. 15, 2022, ECF 129-1 at 6, *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552546 (N.D. Tex. June 7, 2021). And in February 2022, CBP released at least 39,609 more. Defendants' Monthly Report of Mar. 15, 2022, ECF 133-1, *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552546 (N.D. Tex. June 7, 2021). In March 2022, CBP released at least 65,771 aliens into the United States. Defendants' Monthly Report of April 15, 2022, ECF 136-1, *Texas v. Biden*, No. 2:21-cv-067-Z (N.D. Tex.). In April 2022, CBP released at least 110,207 more. Defendants' Monthly Report of May 16, 2022, ECF

139-1, *Texas v. Biden*, No. 2:21-CV-067-Z (N.D. Tex.). CBP released at least 85,372 aliens into the United States in May 2022. Defendants' Monthly Report of June 15, 2022, ECF 140-1, *Texas v. Biden*, No. 2:21-CV-067-Z (N.D. Tex.). In June 2022, CBP released at least 72,611 aliens into the United States. Defendants' Monthly Report of July 15, 2022, ECF 143-1, *Texas v. Biden*, No. 2:21-CV-067-Z (N.D. Tex.).

    55.    Defendant ICE also releases aliens apprehended at the border after CBP transfers custody to ICE in a variety of ways, such as release on bond, release on supervision, or a grant of parole. From January 2021 through September of 2021, ICE released at least 120,930 illegal aliens into the United States. Defendants' Monthly Report of Dec. 15, 2021, ECF 119-2 at 20, *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552546 (N.D. Tex. June 7, 2021). ICE released another 40,612 from October 1, 2021, through December 5, 2021. Defendants' Monthly Report of Dec. 15, 2021, ECF 119-2 at 18, *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552546 (N.D. Tex. June 7, 2021). ICE released another 19,173 in December 2021, 16,387 in January 2022, 15,974 in February 2022,  14,345 in March 2022, 7,782 in April 2022, 9,946 in May 2022, and 7,031 in June 2022. See Defendants' Monthly Report of Jan. 14, 2022, ECF 124-2 at 4, Defendants' Monthly Report of Feb. 15, 2022,  ECF No. 129-2 at 4; Defendants' Monthly Report of Mar. 15, 2022, ECF No. 133-2 at 4; Defendant's Monthly Report of Apr. 15, 2022, ECF No. 136-2 at 4; Defendants' Monthly Report of May 16, 2022, ECF No. 139-2 at 4; Defendants' Monthly Report of June 15, 2022, ECF 140-2 at 4; Defendants' Monthly Report of July 15, 2022, ECF 143-2 at 3; *Texas v. Biden*, No.

2:21-CV-067-Z, 2021 WL 4552546 (N.D. Tex. June 7, 2021). Altogether, ICE has released at least 252,180 illegal aliens into the United States since January 21, 2021.

56.    Combined, Defendant DHS has released *at least* 1,130,922 illegal aliens from the southern border into the United States between January 21, 2021, and June 30, 2022.

57.    As the cited monthly reports demonstrate, Defendants have done so in numerous ways—none of which comply with federal law. Some aliens were released by CBP or ICE via a grant of parole. Others were released by CBP or ICE with a Notice to Appear and were released on recognizance, rather than detaining the immigrants or returning them to Mexico (or Canada) as required by law. And some 94,577 illegal aliens were released between February 2021 and September 2021 with a "Notice to Report." Defendants' Monthly Report of Dec. 15, 2021 at ECF 119-1 at 12, *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552546 (N.D. Tex. June 7, 2021).[10]

58.    A letter from DHS released in January 2022 stated that of the individuals released with a Notice to Report, slightly less than half (49,859) had checked in with ICE.[11]

59.    Of the 49,859 that had checked in with ICE, 16,293, or about 15 percent had been placed in deportation proceedings with the issuance of a notice to appear.

60.    However, in November 2021, the government issued a memo rescinding the made-up Notice to Report policy and replacing it with the Parole + ATD policy.

---

[10] However, according to a DHS letter released in January by Senator Ron Johnson, 104,171 noncitizens were released with a Notice to Report through August 31, 2021.
[11] https://www.ronjohnson.senate.gov/services/files/F9D5467E-EEC9-4AEC-9156-73C5957CFE57

*See* Exhibit A. The Parole + ATD policy continues the government's misuse of its parole authority in § 1182. (Exhibit A, at 3.)

61.     The November memo authorized the release of migrants into the United States under § 1182 to "avoid crowding in CPB facilities." *Id.* at 3. It claims that 1182's "urgent humanitarian reasons or significant public benefit" standard is satisfied by the "need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities." *Id* at 3.

62.     On July 18, 2022, a new Parole + ADT policy was issued by Defendants Magnus and Johnson. *See* Exhibit B. Exhibit B claims that it "rescinds and replaces all prior guidance regarding the use of Parole + ATD, including but not limited to the November 2, 2021, memorandum." (Exhibit B, p. 1).

63.     The government is claiming that the use of Parole + ATD "yields a significant public benefit in the form of disease-mitigation, as a safety valve to address overcrowding." *Id.* at 2.

64.     The government's assertion that it lacks resources to control the surge of migrants at the border is of its own making as explained in ¶¶ 78-80.

65.     Parole + ATD does not satisfy the "case-by-case" requirement either. *See* 8 U.S.C. § 1182(d)(5)(A). The policy does not require the government to determine that urgent humanitarian reasons or significant public benefits require parole based on an individual alien's circumstances. It permits the release of aliens, *en masse*, to address systemic custody and processing constraints, regardless of individual

circumstances. Over 23,000 migrants were released by the Biden Administration in the first two months of implementing Parole + ATD.[12] More than 377 grants of parole *per day* is not what Congress intended when it amended the statute to add the case-by-case requirement. *See Cruz-Miguel*, 650 F.3d at 199 n. 15 ("this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

66.    The Parole + ATD policy is clearly a continuation of the notice to report policy of declining to issue a notice to appear or charging document when an immigrant arrives at the border. "Upon placing an individual in Parole + ATD, CBP will temporarily pause the completion of the removal paperwork under INA § 240, which will instead be completed at a later date." Exhibit B at 4.

67.    The failure to issue charging documents immediately has important consequences. Once a charging document is served, an alien who fails to appear for his removal proceedings can be ordered removed *in absentia*. After this occurs, the alien can be quickly and easily removed whenever DHS locates him because he already has a final order of removal. DHS cannot obtain a final order of removal for an alien who is not issued a charging document.

68.    Finally, COVID-19 cannot provide a basis for any of the challenged policies given the availability of vaccines and therapeutics, and the fact that the CDC's Title 42 Order remains in effect.

---

[12] *See* footnote 4 (FY 2022).

69.   There is no legal authority for the Biden Administration to release such a massive number of illegal aliens into the United States. *See* ¶ 17.

70.   The Defendants can use the limited parole authority conferred by section 1182(d)(5)(A) "only on a case-by-case basis" and only "for urgent humanitarian reasons or significant public benefit." As demonstrated by their release of *at least* 1,130,922 illegal aliens between January 21, 2021, and June 30, 2022, the Defendants are not making case-by-case determinations that each of these illegal aliens must be released into the United States—rather than detained or returned to Mexico—for "urgent humanitarian reasons" or "significant public benefit." Releasing 1,130,922 illegal aliens into the United States over a 17-month period runs contrary to any plain meaning of "case-by-case," "urgent humanitarian reasons," or "significant public benefit."

71.   Specifically, the Defendants have released over 266,000 immigrants using the Parole + ADT policy since November 2021.

72.   And because there are "no other circumstances [other than parole or return to Mexico or Canada] under which aliens detained under § 1225(b) may be released," *Jennings,* 138 S. Ct. at 844, any releases by the Defendants in a contrary manner violate plain law.

73.   Defendants will no doubt claim that they are overwhelmed by the surge of migrants at the Southwest border and have no choice but to release them. However, the surge at the border is the Biden Administration's own doing.

74.     The Administration increased the number of immigrants at the Southern Border by implementing policies that create a de facto open border policy with two steps. One, getting rid of effective immigration enforcement measures, such as returning immigrants to Mexico and releasing immigrants into the United States with no lawful rationale, and two, using the crisis it created as a basis to violate congressionally mandated requirements in immigration laws.

75.     The Biden Administration has violated the congressionally mandated requirements in the immigration laws. *See, e.g., Texas v. United States*, 524 F. Supp. 3d 598, 652 (S.D. Tex. 2021) (finding the government in violation of the mandatory removal provision in 8 U.S.C. § 1231(a)(1)(A)); *Texas v. United States*, No. 6:21-cv-16, 2021 WL 3683913, at \*42 (S.D. Tex. 2021) (finding the government in violation of the mandatory detention provisions in 8 U.S.C. §§ 1231(a)(2) & 1226(c)).

76.     The Administration has even been found to have violated detention requirements under Section 1225(b), the same requirements Indiana claims the government is violating here. *See Texas v. Biden*, 20 F.4th at 998.[13]

77.     It has been recognized for decades that "lax enforcement of the laws barring entry into this country ... results in the creation of a substantial 'shadow population' of illegal migrants—numbering in the millions—within our borders." *Plyler v. Doe*, 457 U.S. 202, 218 (1982).

78.     At the same time, the Biden Administration asked Congress to *reduce* the number of immigration detention beds available to the Department of Homeland

---

[13] The Supreme Court denied the government a stay. *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (Aug. 24, 2021).

Security (DHS).[14] It has justified this request in part based on "recent decreases in interior enforcement activity."[15]

79.     The Biden Administration could solve the detention capacity issues that it claims justifies the mass release of migrants. It could return migrants crossing the southern border to Mexico pending a determination of their status. Or it could build more detention facilities. DHS has the power to "reprogram and transfer millions of dollars into, out of, and within its account used to fund its detention system."[16] The Biden Administration has opted not to do so.

80.     In addition, the Biden Administration ended the practice of holding families in detention facilities in December 2021.[17]

<u>Irreparable Harm to Indiana</u>

81.     States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). Yet Congress and the Supreme Court has limited their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. Indiana must therefore depend on the federal government to fulfill its duties under the immigration laws, especially when Congress has created

---

[14] *U.S. Immigration and Customs Enforcement Budget Overview*, Department of Homeland Security, https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf (Fiscal Year 2022); *Congressional Research Service, DHS Budget Request Analysis: FY2022*, at 13 (noting that DHS's FY 2022 request "includes a $78 million decrease, representing a reduction in support costs for 1,500 individuals in the average population of adult detainees from FY 2021 (reducing that average to 30,000)).
[15] *Fiscal 2022 Congressional Justification*, U.S. Immigration & Customs Enforcement at p. 43, https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf.
[16] *Report to Congressional Committees: Immigration Detention, Opportunities Exist to Improve Cost Estimates*, United States Government Accountability Office, https://www.gao.gov/assets/gao-18-343.pdf (April 2018).
[17] https://www.axios.com/2021/12/16/biden-ends-migrant-family-detention-border-immigration

mandatory obligations or otherwise limited the President's discretion, and the President is intentionally ignoring those obligations.

82.    As a result, there is little that Indiana can do about the thousands of migrants who have already arrived or will arrive in the state. Some of the aliens released into the U.S. are associated gang members, drug traffickers, or other dangerous criminals.

83.    Many, if not most, of these individuals will remain in the country indefinitely. Between Fiscal Year 2008 and 2019, for example, "32 percent of aliens referred to [immigration courts] absconded into the United States" and refused to show up for their hearings. *Biden*, 2021 WL 3603341 at *4. For those who never receive a notice to appear, a much higher number will abscond. *See* Fiscal Year 2020 Enforcement Lifecycle Report 17, Dept. of Homeland Sec. Off. of Immigr. Stats. (Dec. 2020).

84.    The presence of these illegal aliens in Indiana violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also financially injures the State, as Indiana must pay for educating the children of unlawful migrants, *see Plyler v. Doe*, 457 U.S. 202 (1982), and it must pay the costs of incarcerating the illegal aliens who commit crimes in Indiana.

85.    In accordance with 20 U.S.C. § 6824, the Indiana Department of Education provides a portion of the State's Title III appropriation for English

Learners to become proficient in English and meet state academic standards, to support schools and school districts experiencing an influx of immigrant students.[18]

86.     A significant immigrant influx is experienced if a school has "an increase of at least 20 immigrant students over the average immigrant population of the two preceding years, representing an increase in immigrant student population of at least 25%."

87.     Based upon the influx of immigrant students in eight school districts, the Indiana Department of Education made Title III appropriations in the amount of $183,738.40 for the 2021-2022 school year, in addition to the per-pupil state tuition support payment.

88.     The number of children released to Indiana sponsors rose significantly from 209 children from October 2019 to September 2020 to 1,593 children from October 2020 to September 2021.[19]

89.     The 1,384 additional children arriving between October 2020 and September 2021 would cost Indiana an average of $585,423 for English Language Learner services assuming the children are all school-age and require English Language Learner services.[20] This does not include the additional expenditures by

---

[18] *See* Indiana Department of Education 2021-2023 Title III Immigrant Influx Allocations, https://www.in.gov/doe/files/2021-2023-TIII-Immigrant-Influx-Allocations.pdf

[19] Unaccompanied Children Release Data, https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state

[20] https://www.in.gov/doe/files/2021-2022-NESP-Allocations-Table.pdf (using average of the Non-English Speaking Program rates as the rate depends on the English proficiency level)

Indiana for state tuition support provided for all children enrolled in public schools, which would amount to almost $12 million for the 1,384 children.[21]

90.     Further, if the Defendants' policies are allowed to stand, Indiana will be forced to increase state expenditures on other services, including healthcare. Paroled immigrants would be eligible for Medicaid and the Indiana Children's Health Insurance Program.

91.     The federal government will not reimburse Indiana for all of its extra expenditures on immigrants.

92.     As stated above, approximately 1,200 individuals reported to the Indianapolis ICE office between April 2021 and December 2021 as a result of the Biden Administration's Notice to Report policy.

93.     Based upon information and belief, it is anticipated the number of individuals who arrived in Indiana was higher than 1,200, but many of those receiving a Notice to Report do not report to ICE to initiate immigration proceedings, similar to those who fail to report under the Notice to Appear policy.

94.     In April of 2022, the U.S Department of Justice announced that an immigration court would be coming to Indianapolis in 2023. The new immigration court will assist an "overwhelmed" court in Chicago that has nearly 70,000 pending

---

[21] Ind. Code § 20-43-3-8 (school corporation's foundation amount); Ind. Code § 20-43-6-3 (formula for calculating basic tuition support).

cases.[22] The Department of Justice noted, "opening immigration courts in high-volume areas is one way to meet our stakeholders' needs."[23]

95.     Mexico is now the top importer of fentanyl into the United States.[24] Moreover, the amount of fentanyl seized at the border between January 2021 and December 2021 would kill every man, woman, and child in our country six times over – an increase of more than 30 percent since 2020.[25]

96.     Fentanyl fatalities in Indiana have more than doubled in the last two years.[26] In addition, Indiana had the 13th highest number of fentanyl overdoses in 2021.[27]

97.     In Fort Wayne, Indiana, addiction counselors have warned that the number of fentanyl overdoses in children have grown and worry that the police departments will be overwhelmed.[28]

98.     As of October 2021, the Fort Wayne Police Department had seized 4,792 grams of fentanyl and 90% of the overdose deaths in Huntington County included

---

[22] Indianapolis Star, https://www.indystar.com/story/news/local/marion-county/2022/04/26/immigration-experts-say-indianapolis-immigration-court-long-overdue/7410637001/
[23] *Id.*
[24] Commission on Combatting Synthetic Opioid Trafficking, Final Report; https://www.rand.org/pubs/external_publications/EP68838.html
[25] https://cfp.gov/newsroom/stats/drug-seizure-statistics
[26] Families Against Fentanyl review; https://secureservercdn.net/166.62.108.196/w7l.6b7.myftpupload.com/wp-content/uploads/2022/02/states.pdf?time=1644505441
[27] *Id.*
[28] https://www.wpta21.com/2022/03/25/addiction-counselors-warn-parents-increase-children-overdosing-fentanyl/

fentanyl as a contributing factor, according to the Huntington County Chief Deputy Coroner. [29]

99.     Even more recently, the Plainfield Police Department announced that they found 6.5 pounds of suspected fentanyl pills during a traffic stop near Interstate 70.[30]

100.     Michael Gannon, Indianapolis DEA Special Agent in Charge, stated, "We're seizing thousands of pills all over the entire state."[31]

101.     Upon information and belief, the increase in fentanyl in Indiana is due to the lax border security and increase in immigrants entering the United States.

102.     The number of sex offenders entering the country at the Southern Border has also increased more than 200 percent.

103.     CBP was able to apprehend a Mexican national crossing the border on March 31, 2022, who had previously been convicted of rape and sentenced to 11 years' incarceration in Indiana.[32]

104.     While this immigrant was stopped, there are others who are not apprehended and stay in Indiana to commit crimes.

---

[29] https://www.wane.com/top-stories/us-sees-fentanyl-overdose-record-fort-wayne-mom-makes-plea-to-include-drug-on-routine-testing/
[30] https://www.wthr.com/article/news/crime/fenanyl-pills-drug-bust-plainfield-indiana/531-fd21c16a-31f1-46e3-9b8a-5e3657d2bd27?fbclid=IwAR1Rt1x4XnAeHu_lRhfPpp3MRdjBCMS6mpveStcSVdcscxk5lc49RkRrxQM#l2zdkcwyydi17vfg6wc
[31] *Id.*
[32] CBP News Release, April 1, 2022, https://www.cbp.gov/newsroom/local-media-release/criminal-migrants-and-gang-members-arrested-throughout-rgv

105.   Taking into account future arrivals due to the ongoing and current policies of the Biden Administration, Indiana will continue to incur even more expenses.

## CLAIMS

## COUNT I

### Agency Action that is not in accordance with law and is in excess of authority in violation of the APA (Non-detention policy)

106.   Indiana repeats and incorporates by reference ¶¶ 1-105.

107.   Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

108.   The government's policy of failing to detain arriving aliens is contrary to the mandatory detention provisions in 8 U.S.C § 1225(b)(1) – (2).

109.   Any attempt by the government to justify the releases under its parole authority in § 1182(d)(5)(A) is outside of its statutory authority. The parole authority can be used only "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C.  § 1182(d)(5)(A). Releasing migrants *en masse* to address capacity issues satisfies neither condition.

110.   There is also no regulation authorizing the government's policy. The primary parole regulation, 8 C.F.R. § 212.5, does not speak to the release of arriving aliens *en masse*. And such a regulation would be invalid under the plain text of Sections 1225(b) and 1182(d)(5)(A).

111.    Defendants have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they cannot disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9-12 (D.C. Cir. 2016).

112.    The decision to release thousands of aliens into the country, rather than mandatory detention or returning the aliens to Mexico, exceeds Defendants' statutory authority and is therefore unlawful.

## COUNT 2

### Agency Action that is not in accordance with law and is in excess of authority in violation of the APA (Parole + ATD policy)

113.    Indiana repeats and incorporates by reference ¶¶ 1-112.

114.    For similar reasons, the Parole + ATD policy is unlawful. This policy is found in both the November memo and the July 18, 2022 memo. The mass release of aliens to parole is prohibited. None of the government's reasons satisfy the clear standards in 8 U.S.C. § 1182.

115.    The information set forth in the July memo, whether policy or a post hoc rationalization for existing policy, is contrary to law.

116.    The policy violates the mandatory detention provisions in § 1225 because the policy is not a permitted exercise of the government's power under § 1182.

117.   The implementation of the Parole + ATD policy allowing many aliens to be paroled without following § 1182 is unlawful and in excess of the Defendants' statutory authority.

## COUNT 3

### Arbitrary and capricious agency action in violation of the APA

### (Non-detention policy)

118.   Indiana repeats and incorporates by reference ¶¶ 1-117.

119.   Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

120.   The government clearly has a policy of releasing aliens rather than detaining them as required by 8 U.S.C § 1225(b)(1) – (2).

121.   This policy is arbitrary and capricious because it ignores the cost to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 476 U.S. 743, 752-53 (2015).

122.   Defendants also have not explained their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018), as required by the APA, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

123.   Defendants have not accounted for Indiana's reliance interests, nor have they considered lesser alternatives. Each of these renders Defendants' policy arbitrary and capricious. *Id.*

124.   Defendants did not consider the high rate at which those who are released abscond and do not show up to their immigration proceedings.

125.   Any claim that the policy is justified by resource constraints is pretextual given the government's strategy of reducing immigration resources and detention capacity. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573-74 (2019).

## COUNT 4

### Arbitrary and capricious agency action in violation of the APA

### (Parole + ATD policy)

126.   Indiana repeats and incorporates by reference ¶¶ 1-125.

127.   The memo outlining the current Parole + ATD policy, Exhibit B, is arbitrary and capricious and should be set aside for numerous reasons. Those reasons include that it ignores the costs to the States, *Michigan v. EPA*, 576 U.S. at 752-53, and does not account for reliance interests or consider lesser alternatives, *Regents*, 140 S. Ct. at 1913.

128.   Exhibit B does not provide any reasoned explanation for the policy change, a per se violation of the requirements to provide a reason under administrative law. *See Dep't of Com.*, 139 S. Ct. at 2575-76 ("The reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.")

129.   The government also did not consider the number of those who are subject to Parole + ATD but will not report to an ICE facility if directed to do so; it did not consider whether to increase its detention capacity or reopen any detention

29

centers; and it did not consider whether the Parole + ATD policy creates an impression among potential migrants that traveling to the border will result in release into the United States and heightening the border crisis.

130.    The memo's claim that overcrowding and a lack of resources satisfy the "urgent humanitarian reasons or significant public benefit" requirement is an unreasonable interpretation of § 1182.

131.    The memo states that the use of Parole + ATD allows "for the more rapid decompression of facilities that otherwise may be overcrowded in ways to promote health and safety." *See* Exhibit B, p.3.

132.    Any claim by Defendants that resource constraints justify the policy is pretextual considering the government's strategy of reducing immigration resources and detention capacity. *See Dep't of Com.*, 139 S. Ct. at 2573-74. The government's reliance on the COVID-19 pandemic in the Parole + ADT policy is dubious as it simultaneously claims the power to exclude immigrants to guard public health against the same pandemic by utilizing Parole + ATD for migrants that are not covered by or are excepted from the U.S. Centers for Disease Control and Prevention Title 42 Order. *See* Exhibit B, p. 2-3.

## COUNT 5

### Failure to conduct notice and comment in violation of the APA

### (Parole + ADT Policy)

133.    Indiana repeats and incorporates by reference ¶¶ 1-132.

134.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

135.    The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c).

136.    Even assuming Defendants have discretion to depart from the clear requirements of the INA with respect to arriving aliens, a change of this magnitude required notice and comment. *See Jean v. Nelson*, 711 F.2d 1455, 1483 (11th Cir. 1983) (holding that a significant new, binding government policy regarding immigration detention is subject to notice and comment).[33]

137.    The Parole + ATD memo, Exhibit A, drastically expanded the government's use of its parole authority.

138.    The government granted parole to 80,000 migrants under this policy.[34]

139.    If this does not violate § 1182, the memo affects rights and obligations and at a minimum required notice and comment. *See Chrysler Corp.*, 441 U.S. at 303; *Jean*, 711 F.2d at 1482-83.

---

[33] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). The en banc court did not address the notice and comment argument because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

[34] *See* footnote 4.

140.   In addition, there is no record of the memo being published in any format by the Defendants.

141.   The only way a State or person would be aware of the November policy is to access the docket for the Florida lawsuit.

## COUNT 6

### Agency action unlawfully withheld or unreasonably delayed in violation of the APA (Non-detention policy)

142.   Indiana repeats and incorporates by reference ¶¶ 1-141.

143.   Defendants' refusal to comply with the mandatory-detention provisions in Section 1225 and the limits on their parole authority in Section 1182, as well as their failure to serve charging documents and initiate removal proceedings as required by law qualifies as agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

For these reasons, Indiana asks the Court to:

a) Hold unlawful and set aside the Biden Administration's policy of releasing arriving aliens subject to mandatory detention or return to Mexico and the November memo outlining the Parole + ATD policy.

b) Issue permanent injunctive relief enjoining Defendants from enforcing those policies.

c) Compel the agency to comply with these binding requirements pursuant to 5 U.S.C. §706.

d) Issue declaratory relief declaring the policy unlawful.

32

e) Award Indiana costs and reasonable attorney's fees.

f) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Theodore E. Rokita, #18857-49
Indiana Attorney General

Date: <u>9/7/2022</u>                     <u>*s/ Betsy M. DeNardi*</u>
Betsy DeNardi, 23856-71
Cory Voight, 23180-49
Directors of Complex Litigation

33

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2022, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all registered

parties by operation of the Court's electronic filing system.

Erin T. Ryan
US Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
PO Box 868, Ben Franklin Station
Washington, DC 20044
Erin.t.ryan@usdoj.gov

*s/ Betsy M. DeNardi*
Betsy M. DeNardi
Director of Complex Litigation

OFFICE OF THE INDIANA ATTORNEY GENERAL
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN  46204-2770
Phone:  (317) 232-6231
Fax:     (317) 232-7979
Email:  Betsy.DeNardi@atg.in.gov